# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**V.**

**STEVEN MNUCHIN, SECRETARY, UNITED STATES DEPARTMENT OF THE TREASURY**
**1500 Pennsylvania Ave., N.W.**
**Washington, D.C. 20220**

**-Defendant**

**Case No. 1:20-cv-1059**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Cheyenne River Sioux Tribe and Rosebud Sioux Tribe (together, "Plaintiffs" or "the Tribes") are federally recognized Indian Tribal governments that provide essential governmental services to their members.  By and through counsel, the Tribes state and allege as follows:

## INTRODUCTION

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act

1. ("CARES Act"), H.R. 748, 116th Cong. (2020), to respond to the devastating impacts of the COVID-19 pandemic.  President Trump signed the CARES Act into law on March 27, 2020.  Title V of the CARES Act, Section 5001, amends the Social Security Act by creating the Coronavirus Relief Fund ("Section 601") and appropriating $150,000,000,000 for the fiscal year 2020 for "payments to States, Tribal governments, and units of local government." H.R. 748 at § 601(a)(1).  Title V mandates that the Secretary of the United States Department of the Treasury "shall reserve . . . $8,000,000,000 of such amount for making payments to Tribal governments." Section 601(a)(2)(B).

2. There are 574 federally recognized tribal governments that maintain a government-to-

government relationship with the United States, including the Cheyenne River Sioux Tribe and the Rosebud Sioux Tribe. *See* Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs. 85 Fed. Reg. 5462 (Jan. 30, 2020).  Defendant Steven Mnuchin, Secretary of the U.S. Department of the Treasury ("Defendant" or "Secretary") threatens to defy Congress's mandate by diverting Title V relief funds away from these sovereign tribal governments to more than 230 for-profit Alaska Native Claims Settlement Act ("ANCSA") corporations ("ANC") incorporated under the laws of the state of Alaska.  ANCs are "state-chartered and state-regulated private business corporations," *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 534 (1998), which conduct business worldwide through dozens of subsidiaries, are not "Tribal governments" eligible to receive Title V funds under the plain language of the CARES Act.

**3.**     The Secretary's designation and treatment of these private corporations as Tribal governments reduces the funds available for allocation and distribution to the Plaintiff Tribes and other  federally recognized Tribal governments, who are in dire need of the funds to support the necessary and increased government expenditures caused by the COVID-19 pandemic.  The Secretary is required to disburse all $8 billion by April 26, 2020.  Therefore, the Tribes' injuries are imminent.  The Tribes accordingly request that the Court preliminarily and permanently enjoin Defendant to allocate and disburse all $8billion reserved by Congress to federally recognized Tribal governments, exclusive of ANCs, according to a reasonable formula consistent with the CARES Act.

## JURISDICTION AND VENUE

**4.**     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362.  The Cheyenne River Sioux Tribe and the Rosebud Sioux Tribe maintain government-to-government

relations with the United States and have governing bodies duly recognized by the Secretary of the U.S. Department of the Interior. The Tribes assert claims under the Constitution and laws of the United States, including the Administrative Procedures Act, 5 U.S.C. §§ 701-706. The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

**5.**    The venue is proper in this District pursuant to 28 U.S.C. § 1391(e) as the Defendant, the Secretary of the U.S. Department of the Treasury, is an officer of the United States, and as a substantial part of the actions or omissions giving rise to the claims occurred in this District, a substantial part of the property that is the subject of the action is situated in this District, and Defendant maintains his principal place of business in this District.

**PLAINTIFFS**

**6.**    Plaintiff Cheyenne River Sioux Tribe is a federally recognized Indian tribal government whose governing body is recognized by the Secretary of the Interior. *See* 85 Fed. Reg. at 5,463. The Cheyenne River Sioux Tribe is responsible for the health, safety, and welfare of its members. The Cheyenne River Sioux Tribe is comprised of four of the seven bands of the Lakota: *Itazipco* (Sans Arc), *Mnicojou* (Planters by the Water), *Oohenumpa* (Two Kettle), and *Siha Sapa* (Blackfoot). The Cheyenne River Sioux Tribe exercises powers of self-governance and jurisdiction over the Cheyenne River Sioux Reservation, which the Tribe reserved to itself in the Treaty of Fort Laramie with the Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749 ("1851 Fort Laramie Treaty") and the Treaty with the Sioux – Brule, Oglala, Mniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arc, and Santee – and Arapahoe, April 29, 1868, 15 Stat. 635 ("1868 Fort Laramie Treaty"), and as set forth in the Act of March 2, 1889, 25 Stat. 888. The Cheyenne River Sioux Tribe brings this action on its own behalf and the behalf of its members.

7.      Plaintiff Rosebud Sioux Tribe is a federally recognized Indian tribal government whose governing body is recognized by the Secretary of the U.S. Department of the Interior.  *See* 85 Fed. Reg. at 5,465.  The Rosebud Sioux Tribe is responsible for the health, safety, and welfare of its members.  Also known as the Sicangu Oyate, the Rosebud Sioux Tribe is a branch of the Lakota people and is part of the Oceti Sakowin (Sioux Nation).  The Oceti Sakowin consists of the Seven Council Fires: the Thítȟuŋwaŋ (Teton or Lakota), Bdewákaŋthuŋwaŋ (Mdewakanton), Waȟpéthuŋwaŋ (Wahpeton), Waȟpékhute (Wahpekute), Sisíthuŋwaŋ (Sisseton), Iháŋkthuŋwaŋ (Yankton), and Iháŋkthuŋwaŋna (Yanktonai).  The Rosebud Sioux Tribe exercises powers of self-governance and jurisdiction over the Rosebud Indian Reservation in South Dakota.  It is also a signatory to the 1851 and 1868 Fort Laramie Treaties.  The Rosebud Sioux Tribe brings this action on its own behalf and the behalf of its members.

8.      Plaintiff Oglala Sioux Tribe is a federally recognized Indian tribal government whose governing body is recognized by the Secretary of the U.S. Department of the Interior.  *See* 85 Fed. Reg. at 5,465.  The Oglala Sioux Tribe is responsible for the health, safety, and welfare of its members.  Also known as the Oglala Oyate, the Oglala Sioux Tribe is a branch of the Lakota people and is part of the Oceti Sakowin (Sioux Nation).  The Oceti Sakowin consists of the Seven Council Fires: the Thítȟuŋwaŋ (Teton or Lakota), Bdewákaŋthuŋwaŋ (Mdewakanton), Waȟpéthuŋwaŋ (Wahpeton), Waȟpékhute (Wahpekute), Sisíthuŋwaŋ (Sisseton), Iháŋkthuŋwaŋ (Yankton), and Iháŋkthuŋwaŋna (Yanktonai).  The Oglala (Scatters His Own) are one of the Lakota bands. The Oglala Sioux Tribe exercises powers of self-governance and jurisdiction over the Pine Ridge Indian Reservation in South Dakota.  It is also a signatory to the 1851 and 1868 Fort Laramie Treaties.  The Pine Ridge Sioux Tribe brings this action on its own behalf and the behalf of its members.

## **DEFENDANT**

9.      Defendant Steven Mnuchin, the Secretary of the U.S. Department of the Treasury ("Treasury"), is charged by Congress with allocating and distributing relief funds to Tribal governments under Title V of the CARES Act and is sued in his official capacity.  The Defendant's actions violate the plain language of the Act and threaten the Tribes with imminent irreparable injury, as set forth below.

## **THE CORONAVIRUS AND COVID-19 PANDEMIC**

10.      In December 2019, a new coronavirus known as SARS-CoV-2 was detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the Novel Coronavirus strain COVID-19.  On March 11, 2020, the World Health Organization declared that the COVID-19 outbreak can be characterized as a pandemic, stating its deep concern over both the alarming severity of global spread and the alarming levels of government inaction as the rates of infection continued to rise.[1]

11.      On March 13, 2020, President Trump issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, recognizing the preventative and proactive measures taken by all levels of government to slow the spread of the virus and treat those affected.  Proclamation No. 9,994, 85 Fed. Reg. 15,337 (Mar. 18, 2020)

12.      According to the Centers for Disease Control and Prevention (CDC), as of April 21, 2020, the United States has experienced 776,093 confirmed cases of COVID-19 and suffered 41,758 deaths.[2]  The CDC reports that "[t]he federal government is working closely with state, local,

---

[1] Tedros Adhanom Ghebreyesus, WHO Director-General's opening remarks at the media briefing on COVID-19, World Health Org. (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Ctrs. for Disease Control and Prevention, Cases in U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-

tribal, and territorial partners, as well as public health partners, to respond to this situation."[3]

13.     COVID-19 is causing devastating harm in Indian country.  By way of just a few examples, as of April 15, 2020, the Navajo Nation alone has reported 921 cases and 38 deaths related to COVID-19.[4]  The Pueblo of Zuni has reported 33 cases,[5] and the Cherokee Nation has reported 28 cases with one fatality as of April 9, 2020.[6]  Native Americans suffer from disproportionately high rates of diabetes, cancer, heart disease, asthma, which subject them to a greater risk of fatal complications from COVID-19.

### THE IMPACT OF COVID-19 ON TRIBES' GOVERNMENT AND CITIZEN

14.     Numerous members of Congress spoke directly to the tremendous hardships that COVID-19 has inflicted on federally recognized Tribal governments during the drafting of the Title V Tribal government stabilization fund.  The ongoing pandemic has required Tribal governments, including the Cheyenne River Sioux Tribe and the Rosebud Sioux Tribe, to engage in robust public health activities and to provide emergency public assistance services to protect their citizens, who are among the most impoverished and disadvantaged in the nation.  At the same time, Tribal revenues derived from tribally-owned businesses that would normally help support Tribal governmental activities to help fight spread of the virus and to protect their communities, especially their elders and other high-risk populations, have evaporated overnight.

15.     The Cheyenne River Sioux Tribe, however, does not enjoy the luxury of relying on

---

updates/cases-in-us.html (last visited Apr. 21, 2020)
[3] Ctrs. for Disease Control and Prevention, Situation Summary, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last updated Apr. 7, 2020).
[4] Press Release, Office of the President and Vice President, The Navajo Nation, 83 New Cases of COVID-19 and Five More Deaths Reported (Apr. 15, 2020), https://tinyurl.com/y744pcpg.
[5] Press Release, Pueblo of Zuni, Public Notice to the Zuni Community (Apr. 15, 2020), http://www.ashiwi.org/COVID19/DailyPSAUpdate4-15-20.pdf.
[6] Chris Polansky, Following First Death, Cherokee Nation Braces for Increase in Coronavirus Cases, Pub. Radio Tulsa (Apr. 9, 2020), https://www.publicradiotulsa.org/post/following-first-death-cherokee-nation-braces-increase-coronavirus-cases.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

numerous tribal business entities to provide Tribal governmental revenue because of its remote location and economic disadvantage.  Instead, the Cheyenne River Sioux Tribe relies heavily on its agricultural economy.  The pandemic has put this year's growing season in serious jeopardy.  Losses by individual growers will flow up and impact the Tribal government.  The Cheyenne River Sioux Tribe's General Fund consists of approximately $6 million derived from agricultural leases, which are now at risk.

16.     The Cheyenne River Sioux Reservation is located in north-central South Dakota and is comprised of 2,833,158 acres of trust land.  The Reservation is approximately 90 miles wide and 60 miles long.  The Cheyenne River Sioux Tribe has 21,965 enrolled members, about 10,000 of whom live in 22 tribal communities spread across this vast Reservation.

17.     The most recent census revealed that Ziebach County on the Cheyenne River Sioux Reservation is the poorest in the nation, where about 62% of residents live in poverty.

18.     The Cheyenne River Sioux Tribe provides governmental functions similar to those that a state provides.  The Tribe operates a housing authority that provides housing to over 650 families on the Cheyenne River Sioux Reservation.  The Tribe provides land and natural resource management through a Tribal Game, Fish, and Parks Department, Tribal Environmental Protection Department, and agricultural management.  The Tribe operates various public safety entities, such as law enforcement and animal control.  The Tribe operates a robust Tribal court system, including a public defender's office and a prosecutor's office, in addition to the judiciary.  The Tribe also provides human welfare services, such as Indian Child Welfare, emergency victim shelters, family violence response, homeless shelters, the WIC program, and food distribution.  The Tribal Education Department operates six schools in addition to Head Start.  The Tribal Health Department provides general medical services, behavioral health counseling, addiction services,

dental care, a community health program, a fitness center, and several diabetes programs.

19.     The COVID-19 emergency has put the Cheyenne River Sioux people in dire jeopardy. Remoteness and millions of acres of land mean a lack of adequate infrastructure.  The Tribal government has 1,700 miles of road to maintain, many of which are unpaved.  The Tribe receives federal funding to maintain only 300 miles of road.  During certain times of the year, like now, wet conditions and melting snow make some roads nearly impassable.  Compounding that issue, several roads are still closed after the historic flooding in March 2019 destroyed entire swaths of the road all over the Reservation.  In many areas, there is no cell phone or internet service. Residents of outlying communities must travel up to 90 miles to reach basic Indian Health Services ("IHS") medical care at the Tribal headquarters in Eagle Butte, South Dakota.  This facility only has only eight inpatient beds, six ventilators, two negative pressure rooms, inadequate staff, and zero respiratory therapists to care for Reservation's 10,000 tribal members.  If more advanced medical intervention is needed for a COVID-19 patient, IHS has indicated that the patient will be transferred to an off-Reservation facility, the closest of which is 175 miles (three hours) away.

20.     The Cheyenne River Sioux Tribe's initial COVID-19 Response Plan initiated health and safety checkpoints at the borders of the Reservation, closed schools, and recommended that local businesses, restaurants, bars, and the like should be closed or converted to curbside or takeaway services.  On April 8, 2020, the Tribe's Executive Committee passed two Emergency Executive Orders.  Emergency Executive Order #02.2-2020-CR required 14-day mandatory isolation for infected or suspected infected persons upon return to the Reservation from either community spread areas of South Dakota or anywhere outside the state, including provisions for court-ordered quarantine if the person is non-compliant with Health Department voluntary quarantine procedures.  The second Order, Emergency Executive Order #02.3-2020-CR, issued a Stay-at-

Home Recommendation, in addition to a prohibition on gatherings of ten or more people, an order closing all non-essential businesses, and limiting travel within, into, or out of the Reservation, to only essential activities.  All non-essential government offices have also been closed, and those employees placed on administrative leave.  The Tribal Health Department is providing essential services alongside pandemic preparations and is delivering medications to patients in order to limit travel.

21.     The Cheyenne River Sioux Tribe activated their emergency response command center with the Declaration of Emergency.  The Command Center coordinates essential Tribal resources during crises and operates as a Reservation-wide point of contact for the public and entities during the crisis.  The Command Center coordinates increased food distribution demand and has opened an emergency food bank in response to the increased need of Tribal members.  Policing efforts have increased exponentially with the border patrol and checkpoint efforts, with over 150 deputies hired as of April 18, 2020.

22.     As of April 21, 2020, there are no confirmed cases of COVID-19 on the Cheyenne River Reservation.

23.     The Rosebud Sioux Tribe of the Rosebud Indian Reservation is located in south-central South Dakota, along the border with Nebraska.  The Rosebud Indian Reservation was established under the 1868 Fort Laramie Treaty.  Today, the Reservation encompasses all of Todd County, with a patchwork of land in Mellette, Trip, Gregory, and Brule Counties.

24.     On March 13, 2020, Rosebud Sioux Tribe President Rodney Bordeaux issued an emergency declaration regarding the COVID-19 pandemic.  On March 27, 2020, President Bordeaux issued a Stay at Home order.  In response to the Stay at Home order, the Rosebud Sioux Tribe has placed on administrative leave roughly 600 of its approximate 800 Tribal employees.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Only government employees providing essential services are currently working.  To date, the Tribe has been able to avoid furloughing its employees on administrative leave.  The Tribal government is almost completely closed.  The Stay at Home order has also forced the Tribe to close the casino, a source of significant revenue.   In addition, the Rosebud Sioux Tribe has also closed is transportation department on the Reservation, ending much-needed transportation to tribal members for groceries and medical appointments.

25.     The Rosebud Sioux Tribe needs to construct quarantine facilities, procure personal protective equipment ("PPE"), and establish checkpoints on roads leading into the Reservation. CARES Act funding would support these efforts, including purchasing needed medical equipment and PPE and paying for increased law enforcement to staff the checkpoints and continue to provide law enforcement services across the Reservation.  As of the last count, the IHS hospital only had 100 COVID-19 test kits, with almost a third already used.

26.     As part of its governmental services, the Rosebud Sioux Tribe operates and maintains its own rural water system, the Rosebud Sioux Rural Water Supply System, which is part of the larger Mni Wiconi Rural Water Supply Project.  The Rosebud Water System and the Mni Wiconi Project were established by Congress "to ensure that adequate and safe drinking water supplies are available to meet the economic, environmental, water supply, and public health needs of the . . . Rosebud Sioux Tribe."  Mni Wiconi Project Act of 1988, Pub. L. No. 100-516, § 2(a)(5), 102 Stat. 2566 (1988), *as amended* Pub. L. No. 103-434, § 803(a)(3), 108 Stat. 4526 (1994).  These water systems provide water to more than 51,000 people—Indian and non-Indian—on the Rosebud, Pine Ridge, and Lower Brule Indian Reservations, and West River/Lyman-Jones, South Dakota, and provides one-sixth of all water in South Dakota.  The Rosebud Water System provides water for Tribal members on and off the Reservation in Todd, Greggory, Tripp, and Lyman Counties.  The

Tribe is developing plans to assist utility customers with bills and has suspended evictions within the Reservation.

27.     As of April 21, 2020, there has been only one confirmed case of COVID-19 on the Rosebud Indian Reservation, with no deaths.  This one patient has subsequently recovered.

28.     The Oglala Sioux Tribe acted quickly in response to the COVID-19 pandemic, with the Tribal President establishing and enacting a COVID-19 Task Response team and issuing a temporary travel moratorium on March 8, 2020. President Bear Runner declared a State of Emergency on March 10, 2020, and the Tribal Council affirmed this declaration by Tribal Council Resolution No. 20-70 on March 13, 2020. The Tribal Council took swift action to close its two casinos, which provides monthly allocations to its nine (9) districts to support the general health and welfare of Tribal members and to place its non-essential and at-risk employees on administrative leave. A large number of Tribal programs have been closed, including the Transit Program and Credit and Finance Program, that reduce Tribal members' limited access to transportation and funds.  The Tribal programs that remain open, including those under the Tribe's Master Health Contract, like the Ambulance Program were severely underfunded and limited prior to the COVID-19 pandemic and are now stretched beyond their limits due to the public health emergency.

29.     The Tribal Council also adopted a Shelter-in-Place Health Order, Ordinance No. 20-18, (Shelter In Place) in order to help decrease the spread of infection within the boundaries of the Reservation, adopted Ordinance No. 20-26 (Reservation-Wide Curfew) in order to limit normal travel during certain hours, and adopted Ordinance No. 20-28 (Border Monitoring Health Order and Coordinated Border Monitoring Plan) in order to help decrease the spread of infection from outside the boundaries of the Reservation. The Oglala Sioux Tribe hired a Tribal member-owned

unarmed security company to assist law enforcement and to establish checkpoints on roads leading into the Reservation and established a system of travel passes for essential travel. Additionally, President Bear Runner ordered a lockdown of the Reservation borders on April 7, 2020, by Executive Order #20-02, and again on April 11, 2020, by Executive Order #20-03, which is still in place.

30.     In addition to supporting the Ordinances and Executive Orders already implemented by the Oglala Sioux Tribe, the Tribe will need to construct quarantine facilities, procure PPE, establish field hospitals, purchase medical equipment, and pay for increased law enforcement and supplemental security to staff the checkpoints across the Reservation. Since the COVID-19 pandemic, there has been a rise in violence on the Reservation. CARES Act funding is crucial to support these efforts and continue to protect the Oglala Sioux Tribe and all residents of the Pine Ridge Indian Reservation.

## CONGRESS APPROPRIATED CORONAVIRUS RELIEF FUNDS FOR TRIBAL GOVERNMENTS, WHICH DO NOT INCLUDE ALASKA NATIVE CORPORATIONS

31.     Title V of the CARES Act, Section 5001, amends the Social Security Act by creating the Coronavirus Relief Fund ("Section 601") and appropriating $150,000,000,000 for the fiscal year 2020 "payments to States, Tribal governments, and units of local government." Section 601(a)(1). Title V mandates that the Secretary of the U.S. Department of the Treasury "shall reserve . . . $8,000,000,000 of such amount for making payments to Tribal governments." Section 601(a)(2)(B). The Secretary is required to disburse these stabilization funds to Tribal governments "not later than 30 days after the date of enactment of this section," Section 601(b)(1), that is by April 26, 2020.

32.     States, Tribal governments, and units of local government must use Title V funds "to cover

only those costs of the State, Tribal government, or unit of local government that— (1) are necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19); (2) were not accounted for in the budget most recently approved as of the date of enactment of this section for the State or government; and (3) were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020." Section 601(d).

33.     The portion of the $8 billion paid "to a Tribal government shall be the amount the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government (or a tribally-owned entity of such Tribal government) relative to aggregate expenditures in the fiscal year 2019 by the Tribal government (or tribally-owned entity) and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for the fiscal year 2020 are distributed to Tribal governments." Section 601(c)(7).

34.     Under Title V, "[t]he term 'Tribal government' means the ***recognized** governing body* of an Indian Tribe." Section 601(g)(5) (emphasis added).

35.     Title V further provides that "[t]he term 'Indian Tribe' has the meaning given that term in section 4(e) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304(e))." Section 601(g)(1).

36.     ANCs are not Tribal governments and do not have recognized governing bodies.

37.     ANCs thus are not eligible to receive any Coronavirus Relief Fund payments under Title V of the CARES Act. The statutory language is unambiguous, and the Secretary must carry out the intent of Congress by disbursing relief funds to federally recognized Tribal governments, exclusive of ANCs.  The Secretary does not have the discretion to disregard Congress's mandate

by designating and treating ANCs as "Tribal governments."

38.     Congress's mandate makes perfect sense.  ANCs are not governments—they are for-profit corporations incorporated under the laws of the state of Alaska, created pursuant to ANCSA.  *See* 43 U.S.C. § 1602(g), (j) (defining Alaska Native regional corporations and village corporations). These private corporations, like other corporations, are owned by their shareholders, *including non-Indian shareholders*.  ANCs, like other corporations, have access to funding opportunities under other sections of the CARES Act, whereas Tribal governments are not eligible for any of those alternative funding sources.  Congress is clear that Title V relief funds are to supplement "government" budgets, not corporate coffers.  Section 601(d)(2).

39.     There are more than 230 separate ANCs, including twelve regional corporations and approximately 225 village corporations.[7]

40.     The twelve regional corporations alone have over 138,000 shareholders,[8] and own scores of corporate subsidiaries, operating in all 50 states and countries across the globe.[9]  The twelve regional corporations are specifically provided for in ANCSA at 43 U.S.C. § 1606, which divided the state of Alaska into "twelve geographic regions, with each region composed as far as practicable of Natives having a common heritage and sharing common interests."  Shareholders of the 230 ANCs and village corporations may also be shareholders of the regional corporations. Their varied business holdings include construction, pipeline maintenance, real estate

---

[7] Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).  A 13th Regional Corporation was also formed for non-resident Alaska Natives, but the current status of the 13th Regional Corporation is unclear.  See, e.g., ANCSA Reg'l Ass'n, About the Alaska Native Claims Settlement Act, https://ancsaregional.com/about-ancsa/ (last visited Apr. 15, 2020) (noting that the 13th Regional Corporation was involuntarily dissolved by the State of Alaska in 2013).

[8] ANCSA Reg'l Ass'n, Economic Impacts, https://ancsaregional.com/economic-impacts/ (last visited Apr. 15, 2020).

[9] Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020); NANA Reg'l Corp. Inc., Overview (May 17, 2017), https://www.nana.com/regional/shareholder-relations/Shareholder-Preference/files/2017_NRC_One_Sheet_OVR_0256_1024_Part1.pdf.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

management, telecommunications, government and military contracting, environmental remediation, facilities maintenance, catering, camp services, venture capital, financial management, and aerospace engineering.[10]   In 2018 and 2019, the 12 regional corporations generated hundreds of millions of dollars of revenue each, with larger corporations generating as much as $3.4 billion.[11]

41.     ANCs do not have "recognized governing bodies."   A "recognized governing body" pertains to a political body that serves the interests of its "citizens," the "body politic," not corporate shareholders.   ANCs are not and cannot be governments because they do not govern, and they do not provide governmental services.   Instead, ANCs have corporate boards of directors and are owned by private individuals.   *See* 43 U.S.C. § 1606(f) (providing that the management of regional corporations "shall be vested in a board of directors").   ANCs do not have "recognized governing bodies," hence they do not qualify as "Tribal governments" under Title V and are not eligible for relief funds.

42.     ANCs are state-chartered, closely held corporations that are carried on primarily for the profit of the shareholders.   *See Native Village of Venetie Tribal Government*, 522 U.S. at 534. ANC stockholders include non-Indians.   43 U.S.C. § 1606(3)(A).   As conventional, state-chartered corporations, ANCs are governed and regulated by conventional Alaska state corporate law.   *See* 43 U.S.C. § 1602(g), (j), (m), (n), (o); *see also* Alaska Stat. § 10.06.960.   Alaska corporate law is consistent with general principles of corporate law and mandates that ANCs are managed in the best interest of the corporation and to maximize the profit of the shareholders.   *See* Alaska Stat. §

---

[10] See Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020); Alaska Bus., The 2019 Top 49ers, https://digital.akbizmag.com/issue/october-2019/the-2019-top-49ers/ (last visited Apr. 15, 2020).

[11] See Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).

10.06.450.

**43.**    Even if such boards could be characterized as "governing bodies," which they cannot, these boards are not "recognized."   "Recognition" is an Indian law term of art that refers to entities with a government-to-government relationship with the United States, which ANCs simply do not have. While the Secretary of the Interior recognizes Tribal governments, they do not recognize as authoritative the so-called governing bodies of ANCs.   *See, e.g.,* 85 Fed. Reg. at 5462 ("The listed Indian entities are acknowledged to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Tribes.").   ANCs openly represent in their own public-facing materials that they do not maintain a government-to-government relationship with the United States.[12]

---

[12]   See, e.g., ANCSA Reg'l Ass'n, Overview of Entities Operating in the Twelve Regions, https://ancsaregional.com/overview-of-entities/ (last visited Apr. 15, 2020) (stating that both regional corporations and village corporations "do not possess a government-to-government relationship with the federal government").

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

**DEFENDANT'S DESIGNATION OF ALASKA NATIVE CORPORATIONS AS TRIBAL GOVERNMENTS VIOLATES THE CARES ACT**

44.    Congress mandated that the Secretary may only allocate and distribute Title V relief funds to federally recognized Tribal governments.   Nevertheless, Defendant has determined to treat ANCs as "Tribal governments" for purposes of making Title V relief payments.   The Defendant's action violates the CARES Act.

45.    On or about Monday, April 13, 2020, Defendant requested four data points from Tribal governments as a condition of funding to determine amounts that the Defendant would approve to be paid under Title V, publishing a Certification for Requested Tribal Data ("Certification") form on the Treasury website.[13]

46.    These four data points include: (1) current tribal enrollment; (2) current land base, including lands held by the tribe and lands held by tribally-owned entities, including lands in which the Tribe owns at least 51% ownership; (3) total employees, tribal employees and employees of any tribally-owned entity, including entities in which the tribe maintains at least 51% ownership; and (4) total expenditures for last fiscal year.

47.    The Certification form is clear that Defendant has determined to treat ANCs as Tribal governments for purposes of allocating and disbursing Title V Coronavirus Relief Funds.   The Certification asks each funding applicant to state its "Population: Total number of Indian Tribe Citizens/Members/*Shareholders*, as of January 1, 2020" (emphasis added) and includes a Note defining "Indian Tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688, 43 U.S.C. 1601 et seq.) [sic],

---

[13] U.S. Dep't of the Treasury, Submission Required for Receipt of Coronavirus Relief Fund Payments Apr. 13, 2020), https://forms.treasury.gov/caresact/stateandlocal.

which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."[14]

48.     The Certification also asks for "Land Base: Total number of land acres held by the Indian Tribe and any tribally-owned entity (to include entities in which the Indian Tribe maintains at least 51% ownership) as of January 1, 2020 (to include lands held in trust by the United States, owned in restricted fee status, owned in fee, or selected pursuant to the Alaska Native Claims Settlement Act)."  Lands "selected pursuant to the Alaska Native Claims Settlement Act" are ANC-owned lands.  In *Alaska v. Native Village of Venetie Tribal Government*, the Supreme Court explained that through ANCSA, "Congress authorized the transfer of . . . approximately 44 million acres of Alaska land to state-chartered private business corporations," 522 U.S. at 524, "without any restraints on alienation or significant use restrictions, and with the goal of avoiding 'any permanent racially defined institutions, rights, privileges, or obligations.'" *Id.* at 532-33 (citations omitted).[15] ANC-owned lands are not Indian country.  *Id.*

49.     The Certification further requests that Tribal governments provide "[t]otal expenditures for the most recently completed fiscal year."  The Certification provides no further clarification of "expenditures."  The U.S. Treasury Department provided no guidance.  The U.S. Department of Interior provided no further guidance other than an April 14, 2020, document entitled "Coronavirus Relief Fund Web Portal Registration Guidance for Tribal Governments from Indian Affairs," which states simply that Tribal governments "will need the following information: . . . [t]otal aggregate actual expenditures for the most recently completed fiscal year."[16]

---

[14] *Id.*
[15] See also ANCSA Reg'l Ass'n, Overview of Entities Operating in the Twelve Regions, https://ancsaregional.com/overview-of-entities/ (last visited Apr. 15, 2020) ("Through ANCSA, Alaska Native corporations hold title to roughly 44 million acres of land held in private corporate ownership.").
[16] Department of the Treasury Tribal "Certification" Form,  Indianz.com, https://www.indianz.com/covid19/?p=2696 (last accessed Apr. 21, 2020).

50.     The Treasury website provides that "Governments eligible for payments must provide payment information and required supporting documentation through the electronic [Certification] form accessible below.  To ensure payments are made within the 30 day period specified by the CARES Act, governments must submit completed payment materials not later than 11:59 p.m. EDT on April 17, 2020.  Eligible local and Tribal governments that do not provide required information—and in the case of a local government, the required certification—by 11:59 p.m. EDT on April 17, 2020, may not receive any payment from the Fund."[17]  According to the website of the U.S. Department of the Interior, Indian Affairs, payments will be paid no later than April 24, 2020, once the recipient has registered through the web portal.[18]

51.     On or about Friday, April 17, 2020, a spreadsheet apparently generated by a government employee with access to materials submitted via the portal was leaked to the public.  The spreadsheet contains the specific data that the Defendant requested in the Certification, sensitive financial, and demographic data.  The release of this critical data constitutes a serious breach of the Defendant's trust responsibility to the subject Tribes and their people and has the potential to jeopardize these vulnerable Tribes' security and livelihood.  The spreadsheet demonstrates, however, that all 12 Alaska regional ANCs and numerous village ANCs apparently have submitted requests for Title V Coronavirus relief funds.  Each regional and village ANC has claimed eligibility for Coronavirus relief funds based on population, land base, employees, and expenditures.

52.     By way of example, the Arctic Slope Regional Corporation, which encompasses Barrow

---

[17] U.S. Dep't of the Treasury, The CARES Act Provides Assistance for State and Local Governments, https://home.treasury.gov/policy-issues/cares/state-and-local-governments (last visited Apr. 16, 2020).

[18] Indian Affairs, U.S. Dep't of the Interior, Indian Affairs to Assist Tribes Eligible to Receive Funding from Treasury Under the Coronavirus Relief Fund (Apr. 14, 2020), https://www.bia.gov/as-ia/opa/online-press-release/indian-affairs-assist-tribes-eligible-receive-funding-treasury-under.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                                     19

and Point Hope, Alaska, claimed 13,021 members, 4,094,101 acres of the land base, 12,146 employees, and reported $3,706,885,000.00 in total expenditures for the last fiscal year.

53.     By contrast, the Cheyenne River Sioux Tribe has roughly 22,000 members, 2.8million acres, nearly 900 employees, and approximately $112,000,000 in total expenditures for the last fiscal year, and the Rosebud Sioux Tribe has roughly 35,600 members, 1.26 million acres, 800 employees, and similar total expenditures.

54.     Defendant's designation of ANCs as Tribal governments for purposes of allocating and distributing Title V Coronavirus Relief Funds is a final agency action for purposes of judicial review under 5 U.S.C. § 704.

## PLAINTIFFS HAVE STANDING TO PURSUE THIS ACTION

55.     Defendant's action threatens to harm the Cheyenne River Sioux Tribe and the Rosebud Sioux Tribe.  The Tribes submitted their Certifications with all required information to the Secretary to receive funds under Title V.  Defendant must distribute these funds by April 26, 2020.

56.     Defendant's illegal allocation of funds to ANCs from the defined, limited pool of Title V Coronavirus Relief Funds reserved to Tribal governments necessarily will require the Defendant to divert those funds from legitimate Tribal governments.  The Cheyenne River Sioux Tribe and the Rosebud Sioux Tribe are in dire need of these funds to cover their governmental costs resulting from the increased, necessary expenditures associated with the COVID-19 pandemic.  The Tribes already struggle to support basic governmental services.  Their most recent budgets did not account for the tremendous financial strain that the pandemic would place on their governmental operations.

57.     The Cheyenne River Sioux Tribe is currently spending an estimated $1,000,000 a week in unbudgeted emergency costs in response to the COVID-19 crisis.  This estimated expense includes

running the Tribal command center, hiring over 150 deputies to secure the borders, paying overtime for essential employees, procuring PPE, running an emergency food bank, and additional policing, food distribution, sanitation, and medical travel costs.  Over two-thirds of that $1000,000 is just the estimated cost for all new and overtime essential employees, as well as emergency assistance to Tribal members who have lost income.

58.     The Tribe's members are also experiencing egregious educational, social, economic, agricultural, and human costs because of the pandemic.  School closures have made school children more vulnerable to hunger.  Some children are unable to complete their work at home because they live in poverty.  The Tribe's development projects are on hold, putting millions of dollars in limbo because construction is shut down.  The Tribe's Indian Child Welfare Department is currently only able to take the most at-risk children into the Tribe's one shelter.  The Family Violence shelter is seeing increased capacity needs.   The Tribal judiciary is only hearing emergency cases while the prosecutor is seeing increased arrests.

59.     The Rosebud Sioux Tribe is similarly situated and faces similar harms and hardships.  The Tribe has placed roughly 600 of its roughly 800 employees on administrative leave as it operates only essential governmental functions.  The Tribe is facing unbudgeted emergency expenses to procure PPE, establish quarantine facilities, and establish and man checkpoints at the entrances to their Reservation.  The Tribe has stopped providing essential transportation services to members, closed its casino—a signification contributor to the Tribe's revenue—and has suspended public wakes and memorials.  The Tribe is also assessing the feasibility of establishing an alternative care site, separate from its HIS hospital to continue to provide healthcare to Tribal members.

60.     The Tribes' necessary pandemic expenditures, alongside the pandemic expenditures of other similarly situated federally recognized Tribal governments, are exactly the costs that

Congress intended the Coronavirus Relief Funds to cover.  Congress did not intend for these funds to be paid to private, for-profit corporations who seek to maximize financial return for their tens of thousands of individual shareholders.

61.     Two scenarios illustrate the injury caused by the Defendant's designation of ANCs as Tribal governments for purposes of allocating and distributing Title V Coronavirus Relief Funds. Under the first scenario, if the Defendant allocates the $8,000,000,000 equally among all 574 federally recognized Tribal governments, each Tribal government would receive just under $14,000,000.   Under a second scenario, if the Defendant includes the 237 ANCs, an equal allocation among all 811 entities would reduce that amount to less than $10,000,000, a difference of more than $4,000,000 for each of the 574 federally recognized Tribal governments.  The Tribes thus would lose approximately 30% of their properly allocated share of Title V funds through the illegal appropriation of those funds to ANCs.

62.     Under the second scenario, the Defendant may allocate the $8,000,000,000, taking into consideration the population, land base, employees, and expenditures of the applicant.  The data requested by the Certification form indicates that the Secretary is considering this approach.  Under this approach, the ANCs will have an outsized impact.  Together, the ANCs own approximately 44 million acres of land.[19]   These landholdings are equivalent to the total trust land base of all federally recognized Tribal governments in the Lower-48 states combined.[20]  The twelve regional ANCs alone have over 138,000 shareholders, employ more than 43,000 people worldwide, and

---

[19] Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).

[20] Office of the Special Tr. for American Indians, U.S. Dep't of the Interior, OST Statistics and Facts, https://www.doi.gov/ost/about_us/Statistics-and-Facts (last visited Apr. 15, 2020) ("The Indian trust consists of 55 million surface acres and 57 million acres of subsurface minerals estates held in trust by the United States for American Indians, Indian tribes and Alaska Natives. Over 11 million acres belong to individual Indians and nearly 44 million acres are held in trust for Indian tribes.").

generated more than $10.5 billion in revenues in 2018.[21]  Under any formula that considers ANCs' corporate shareholders, land base, employees, and expenditures, the relief funds available to federally recognized Tribal governments, including Cheyenne River Sioux Tribe and Rosebud Sioux Tribe, will be vastly reduced, given their comparatively minuscule populations, land base, and economic size.  Furthermore, the utter lack of any formula or guidance as to how the Defendant intends to use the four requested data points suggests that the Defendant and other political appointees will exercise broad discretion to allocate funds.  Considering the existing concerns about the impartiality of current government officials in charge of Tribal coronavirus relief funds,[22] poor tribes like the Cheyenne River Sioux Tribe and Rosebud Sioux Tribe that lack big money and significant political connections could be at a serious disadvantage.

63.     Under either scenario, because many corporate shareholders are tribal members, some entities in Alaska would effectively "double-dip" (in some cases "triple-dip") from the limited pool of funds, with the same community receiving duplicative or triplicate funding—funding allotted to the actual tribal government that is incurring actual COVID-19 related expenses, the village ANC for that community, and the regional ANC for that region.

64.     On the other hand, if the Secretary properly allocates and distributes Title V funds directly to federally recognized Tribal governments only, Alaska Native Tribes may use their funds to determine the most effective way to meet the needs of their communities, consistent with the other requirements of the CARES Act.

---

[21]  See Res. Dev. Council, Alaska Native Corporations, https://www.akrdc.org/alaska-native-corporations (last visited Apr. 15, 2020).
[22]  Jayson O,Neill, Trump's Former Oil Lobby Team Divert Tribal COVID-19 Funds to Big Oil, https://westernvaluesproject.org/trumps-former-oil-lobby-team-divert-tribal-covid-19-funds-to-big-oil/, (Last Visited Apr. 16, 2020)

65.     This Court can redress Plaintiffs' injuries caused by Defendant by awarding declaratory and injunctive relief enjoining Defendant not to treat ANCs as Tribal governments for purposes of allocating and distributing Title V Coronavirus Relief Funds, and enjoining the Secretary to allocate and disburse all $8,000,000,000 reserved by Congress under Title V to federally recognized Tribal governments, exclusive of ANCs, according to a reasonable formula consistent with the CARES Act.

## COUNT I

**(Declaratory and Injunctive Relief under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-2202)**

66.     Plaintiffs restate, reallege, and incorporate by reference all preceding paragraphs and allegations.

67.     The APA authorizes judicial review of federal agency actions.  5 U.S.C. § 702.

68.     The APA provides that the reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  It further provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right.  5 U.S.C. § 706(2)(C).

69.     Under Title V of the CARES Act, ANCs, that are Alaska Native regional corporations and village corporations established under ANCSA, do not meet the statutory definition of "Tribal government" because they do not have a "recognized governing body."

70.      By designating ANCs as Tribal governments for purposes of allocating and distributing Title V Coronavirus Relief Funds, the Secretary has acted in a manner that is arbitrary, capricious,

an abuse of discretion, and not in accordance with the law, in violation of the CARES Act and the

APA, 5 U.S.C. §§ 701-706.  Plaintiffs are entitled to an order declaring the same.

71.      By designating ANCs as Tribal governments for purposes of allocating and distributing

Title V Coronavirus Relief Funds, the Secretary has acted in a manner that is in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right, in violation of the CARES Act and

the APA, 5 U.S.C. §§ 701-706.  Plaintiffs are entitled to an order declaring the same.

72.      Plaintiffs are entitled to a preliminary and permanent injunction enjoining the Secretary

not to designate or otherwise treat ANCs as Tribal governments for purposes of allocating and

distributing Title V Coronavirus Relief Funds, and enjoining the Secretary to allocate and disburse

all $8,000,000,000 reserved by Congress to federally recognized Tribal governments, exclusive of

ANCs, according to a reasonable formula consistent with the CARES Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

73.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 in favor of Plaintiffs that

Defendant's designation of ANCs, that is, Alaska Native regional corporations and village

corporations established under ANCSA, as Tribal governments for purposes of allocating and

distributing Title V Coronavirus Relief Funds is arbitrary and capricious, an abuse of discretion,

and otherwise not in accordance with law.

74.      Preliminarily and permanently enjoin Defendant not to designate or otherwise treat

Alaska Native regional corporations and village corporations as Tribal governments for purposes

of allocating and distributing Title V Coronavirus Relief Funds, and enjoining the Secretary to

allocate and disburse all $8,000,000,000 reserved by Congress to federally recognized Tribal

governments, exclusive of Alaska Native regional corporations and village corporations, according to a reasonable formula consistent with the CARES Act.

**75.**    Award Plaintiffs their reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

**76.**    Grant other such relief as the Court deems just and proper.

Dated:  April 22, 2020

Respectfully submitted,

/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux (DC Bar No. NE001)
BIG FIRE LAW & POLICY GROUP LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com

*Counsel for the Cheyenne River Sioux Tribe*

/s/ Natalie A. Landreth
/s/ Wesley James Furlong
Natalie A. Landreth (D.D.C. Bar No. AK0001)
Erin C. Dougherty Lynch, *pro hac vice pending*
Matthew N. Newman, *pro hac vice pending*
Wesley James Furlong (D.D.C. Bar No. AK0003)
Megan R Condon, *pro hac vice pending*
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Telephone: (907) 276-2466
Facsimile: (907) 276-2466
Email: landreth@narf.org
dougherty@narf.org
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org

*Counsel for Rosebud Sioux Tribe*

/s/ Jennifer Bear Eagle
Jennifer Bear Eagle, *pro hac vice pending*
OGLALA SIOUX TRIBE LEGAL DEPARTMENT
P.O. Box 1204
Pine Ridge, SD 57770
Telephone: (605) 867-2138
Facsimile: (605) 867-2140
Email: JenniferBE@ostlegal.org

*Counsel for Oglala Sioux Tribe*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

*/s/ Nicole Ducheneaux*
Nicole E. Ducheneaux (DC Bar No. NE001)
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: nducheneaux@bigfirelaw.com